## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

LOURDES M. TEODOSIO, AMBER )
BROCK, GAROON J. GIBBS-RACHO )
AND DAMON A. PARKS, SR., )
individually and on behalf of all others )
similarly situated, )
 )
     Plaintiff, )
 )
  v. )
 )
DAVITA, INC., THE BOARD OF )
DIRECTORS OF DAVITA, INC., THE )
PLAN ADMINISTRATIVE COMMITTEE )
OF DAVITA, INC. and JOHN DOES 1-30. )
 )
     Defendants. )

**CIVIL ACTION NO.: _____**

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiffs, Lourdes M. Teodosio, Amber Brock, Garoon J. Gibbs-Racho and DaMon A. Parks, Sr., ("Plaintiffs"), by and through their attorneys, on behalf of the DaVita Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include DaVita, Inc. ("DaVita" or "Company") and the Board of Directors of DaVita, Inc. and its members during the Class Period ("Board")[2] and the Plan

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] As will be discussed in more detail below, the Class Period is defined as March 23, 2016 through the date of judgment ("Class Period").

Administrative Committee of DaVita, Inc. and its members during the Class Period ("Committee").

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

3.      The Tenth Circuit has recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig*., 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law).

4.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See*, "*A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and

2

implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.    The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

9.    Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     At all times during the Class Period, the Plan had at least $1.3 billion dollars in assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $2.6 billion dollars and $2.2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the DaVita Retirement Savings Plan ("2020 Auditor Report") at 4.

11.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) failing to control the Plan's recordkeeping and administration costs.

13.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### Plaintiffs

18.     Plaintiff, Lourdes M. Teodosio ("Teodosio"), resides in Union City, California. During her employment, Plaintiff Teodosio participated in the Plan investing in the options offered by the Plan and the subject of this Complaint and was also subject to the excessive administration and recordkeeping costs alleged below.

19.     Plaintiff, Amber Brock ("Brock"), resides in Fresno, California. During her employment, Plaintiff Brock participated in the Plan investing in the options offered by the Plan and the subject of this Complaint and was also subject to the excessive administration and recordkeeping costs alleged below.

20.     Plaintiff, Garoon J. Gibbs-Racho ("Gibbs-Racho"), resides in Los Angeles, California. During his employment, Plaintiff Gibbs-Racho participated in the Plan investing in the options offered by the Plan and the subject of this Complaint and was also subject to the excessive administration and recordkeeping costs alleged below.

21.     Plaintiff, DaMon A. Parks, Sr. ("Parks"), resides in Florissant, Missouri. During his employment, Plaintiff Parks participated in the Plan investing in the options offered by the Plan and the subject of this Complaint and was also subject to the excessive administration and recordkeeping costs alleged below.

22.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     DaVita is the Plan sponsor and a named fiduciary with a principal place of business being 2000 16th Street, Denver, Colorado. The December 31, 2020 Form 5500 of the DaVita Retirement Savings Plan filed with the United States Department of Labor ("2020 Form 5500") at

1. DaVita describes itself as a "leading healthcare provider focused on transforming care delivery to improve quality of life for patients globally. We are one of the largest providers of kidney care services in the U.S. and have been a leader in clinical quality and innovation for over 20 years." The December 31, 2021 Form 10-K Filed with the United States Securities and Exchange Commission ("Form 10-K") at 2.

25.     DaVita appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. DaVita Inc., Investment Policy Statement and Guidelines Effective as of December 11, 2019 ("IPS") at 5-6. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Accordingly, DaVita during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

27.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Board Defendants</u>**

28.      DaVita, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. IPS at 5-6. Under ERISA, fiduciaries with

the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

30.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.     As discussed above, DaVita appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. IPS at 5-6

32.     As stated in more detail in the IPS, the Committee "at least annually … will consider the investment and administrative fees associated with the Plans' investment options." IPS at 2. Further, the Committee is responsible for "periodically evaluating the Plans' investment performance and recommending investment option changes as needed." IPS at 5. The Committee is also responsible for "[p]eriodically evaluating the overall performance of the providers and consultants in regards to their relationship with the Company." IPS at 6. As will be discussed below, the Committee fell well short of these goals as a fiduciary to plan participants.

33.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

35.    To the extent that there are additional officers, employees and/or contractors of DaVita who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, DaVita officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 23, 2016 through the date of judgment (the "Class Period").

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

37.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 67,1043 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

38.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no

interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

43.     The Plan is a defined contribution plan covering substantially all eligible employees of DaVita. 2020 Auditor Report at 5. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.

*Id.* Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### Eligibility

44.     In general, the Plan covers all employees of DaVita who are age 18 or older. *Id.*

### Contributions

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 5.

46.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to matching contributions made by DaVita, DaVita does provide a contribution of a portion of eligible compensation. 2020 Auditor Report at 6. As detailed in the 2020 Auditor Report, DaVita has "elected to make a discretionary matching contribution to the Plan for each eligible Participant in an amount equal to 50% of the Participant's contributions, up to 6% of Compensation each pay period." *Id.*

47.     Like other companies that sponsor 401(k) plans for their employees, DaVita enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48.     DaVita also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, DaVita likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

50.     With regard to contributions made by participants to the Plan, such contributions vest immediately. 2020 Auditor Report at 6. Generally, contributions made by DaVita are subject to a four-year vesting schedule. *Id.*

### The Plan's Investments

51.     In theory, the Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance, reviews total plan and fund costs each year and reviews the appropriateness of recordkeeping and administrative charges. IPS at 5-6. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

52.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

53.     The Plan's assets under management for all funds as of December 31, 2020 was $2,684,769,000.  2020 Auditor Report at 4.

### Payment of Plan Expenses

54.     During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 9.

## VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

55.     As described in the "Parties" section above, Defendants were/are fiduciaries of the Plan.

56.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

57.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

58.     In fact, in an attempt to discover the details of the Plan's mismanagement, on December 10, 2020, Plaintiffs wrote to DaVita requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated February 3, 2021, DaVita refused to provide any minutes in response to Plaintiffs' request.

59.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

60.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

61.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

62.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

63.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

64.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[5]

65.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

66.     Three of the Plan's funds, having more than $120 million dollars in assets under management in 2020 will be analyzed below as an example of imprudently selected funds. Although two of these funds are pooled separate accounts, these funds do correlate to the broad categories outlined by the ICI Study and thus the comparison is appropriate. The expense ratio for one of these funds during the Class Period was *148%* above the ICI Median (in the case of Voya Small Cap Opportunities) and in another case the expense ratio was *80%* above the ICI Median (in the case of T. Rowe Price Large-Cap Growth Trust  CL B) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessive expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| T. Rowe Price Large-Cap Growth Trust  CL B | 0.56 % | Domestic Equity | 0.31% |

___

[5] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median** |
| Voya Small Cap Opportunities | 0.77 % | Domestic Equity | 0.31% |
| Dodge & Cox Stock Fund | 0.52 % | Domestic Equity | 0.31% |

67.     The high cost of the Plan's funds is even more stark when comparing the Plan's

funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average** |
| T. Rowe Price Large-Cap Growth Trus  CL B | 0.56 % | Domestic Equity | 0.37% |
| Voya Small Cap Opportunities | 0.77 % | Domestic Equity | 0.37% |
| Dodge & Cox Stock Fund | 0.52 % | Domestic Equity | 0.37% |

68.     It is unlikely the Defendants engaged in a prudent process from 2016 through 2020

since the Plan contained at least three funds that had excessive expense ratios when compared to

their peers from 2016 to 2020.

69.     Further, Defendants' failure to obtain reasonably-priced and properly performing

investments from 2016 to 2020 is circumstantial evidence of their imprudent process to review

and control the Plan's costs and is indicative of Defendants' breaches of their fiduciary duties,

relating to their overall decision-making, which resulted in the payment of excessive

recordkeeping and administration fees that wasted the assets of the Plan and the assets of

participants because of unnecessary costs.

    **(B)**    **The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

70.     A clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

71.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

72.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.  Recordkeeping;

B.  Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.  Administrative services related to converting a plan from one recordkeeper to another;

D.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.  Maintenance of an employer stock fund (if needed);

F.  Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

**G.** Plan consulting services, including assistance in selecting the investment lineup offered to participants;

**H.** Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[6] (excluding the separate fee charged by an independent third-party auditor);

**I.** Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

**J.** Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

73.     This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

74.     The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

---

[6]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

    **A.** Loan processing;

    **B.** Brokerage services/account maintenance (if offered by the plan);

    **C.** Distribution services; and

    **D.** Processing of qualified domestic relations orders.

75.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

76.    The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

77.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

78.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*). "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging

a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

79.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

80.    In this matter, using a combination of a flat recordkeeping charge paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

81.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen every three to five years. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

82.     Because the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

83.     Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were significantly above market rates when benchmarked against similar plans.

|  | Participants | Direct Payments | Indirect Payments[7] | Total | Compensation per Participant |
|---|---|---|---|---|---|
| 2016 | 56707 | $1,570,477 | $789,422 | $2,359,899 | $41.62 |
| 2017 | 61109 | $2,276,645 | $651,696 | $2,928,341 | $47.92 |
| 2018 | 65189 | $5,079,213 | $1,187,892 | $6,267,105 | $96.14 |
| 2019 | 66162 | $3,365,876 |  | $3,365,876 | $50.87 |
| 2020 | 67104 | $3,386,630 |  | $3,386,630 | $50.47 |

84.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

85.     The recordkeeper throughout the Class Period was Voya. At all times during the Class Period, the Plan had at least 56,000 participants and over $1.3 billion dollars in assets under management. As of 2020, the Plan had over 67,000 participants and over $2.6 billion dollars in assets under management making it eligible for some of the lowest fees on the market.

---

[7] Indirect costs are taken directly from those amounts reported on the Form 5500s. Since there may be additional amounts of indirect costs taken from revenue sharing these amounts are likely conservative.

86.     Let's start with what another major recordkeeper in the marketplace, Fidelity, would pay if it were in Defendants' shoes. In a recent lawsuit where Fidelity's multi-billion dollar plan with over 50,000 (fifty thousand) participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

87.     Specifically, Fidelity stipulated as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

88.     The Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for recordkeeping and administration fees as low as $14 and up to $21 per participant in recordkeeping and administration fees.

89.     Looking at recordkeeping costs for other plans of a similar size as of 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart below analyzes a few well managed plans having more than 30,000 participants and approximately $3 billion dollars in assets under management:

| Comparable Plans' R&A Fees Paid in 2019[8] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs[9] | R&A Costs on Per-Participant Basis | Record-keeper |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | **$30** | Alight Financial |

Because, as described above more participants equals less per participant recordkeeping fees, the Plan should have been able to easily negotiate less per participant recordkeeping fees than was paid by the above funds that had about half as many Plan participants as the Plan.   In other words, the Plan, with over 67,000 participants and over $2.6 billion dollars in assets in 2020, should have been able to negotiate per participant recordkeeping costs anywhere from $14 per participant to $21 from the beginning of the Class Period to the present.  Failure to do so resulted in millions of dollars of damages to the Plan and its participants.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

[8] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[9] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

90.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

91.     At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

92.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

93.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's recordkeeping and administration fees.

94.     The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan recordkeeping and administration costs.

95.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

96.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

97.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendants' own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against DaVita and the Board Defendants)**

98.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

99.    DaVita and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

100.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

101.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

102.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;
>
> (b)    failing to monitor the processes by which Plan investments were evaluated; and
>
> (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's recordkeeping and administration, all to the detriment of the Plan and Plan participants' retirement savings.

103.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

104.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  March 23, 2022                    **CAPOZZI ADLER, P.C.**

                                          _/s/ Donald R. Reavey_
                                          Donald R. Reavey, Esquire
                                          PA Attorney ID #82498
                                          2933 North Front Street
                                          Harrisburg, PA 17110
                                          donr@capozziadler.com
                                          Telephone:  (717) 233-4101
                                          Fax:  (717) 233-4103

                                          _/s/ Mark K. Gyandoh_
                                          Mark K. Gyandoh, Esquire
                                          Gabrielle Kelerchian, Esquire
                                          PA Attorney ID # 88587
                                          PA Attorney ID # 324248
                                          **CAPOZZI ADLER, P.C.**

312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
gabriellek@capozziadler.com
Telephone:  (610) 890-0200
Fax:  (717) 233-4103

Counsel for Plaintiffs and the Putative Class

Addresses of Plaintiffs as Required by Local Procedure:

<table>
<tr><td>Lourdes M. Teodosio</td><td>Amber Brock</td></tr>
<tr><td>4269 Oliver Way</td><td>5466 N. Figarden Drive, Apt. 135</td></tr>
<tr><td>Union City, CA  94587</td><td>Fresno, CA  93722</td></tr>
<tr><td></td><td></td></tr>
<tr><td>DaMon A. Parks, Sr.</td><td>Garoon J. Gibbs-Racho</td></tr>
<tr><td>3205 Chateau De Marcay Drive</td><td>11606 Gorham Avenue, #6</td></tr>
<tr><td>Florissant, MO  63031</td><td>Los Angeles, CA  90049</td></tr>
</table>