# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| LOURDES M. TEODOSIO, et al., | |
| Plaintiffs, | Case No. 1:22-cv-00712-WJM |
| v. | Judge William J. Martinez |
| DAVITA, INC., et al., | Magistrate Judge Maritza Dominguez Braswell |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS UNDER RULES 12(B)(1) AND 12(B)(6) AND MEMORANDUM OF LAW IN SUPPORT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

RELEVANT FACTS AND ALLEGATIONS ..................................................... 3

    I.    DaVita, The Committee, And The Plan's Investments And Recordkeeping Fees ................................................................................ 3

    II.    Plaintiffs' Investments And Recordkeeping Fees ................................. 5

ARGUMENT ...................................................................................................... 6

    I.    Plaintiffs' Claims Should Be Dismissed On Standing Grounds Under Rule 12(b)(1). ............................................................................ 6

    II.    Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(6). ........... 8

        A.    Plaintiffs' Investment Fee Allegations Fail. ............................. 10

        B.    Plaintiffs' Recordkeeping Allegations Fail. ............................. 12

        C.    Plaintiffs' "Total Plan Cost" Allegations Fail. ........................ 17

    III.    Plaintiffs' Derivative Failure To Monitor Claims Against DaVita And Its Board Fail. ................................................................................ 20

    IV.    Certification Of Conference. .................................................................. 20

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Coca-Cola Bottlers' Ass'n,*
2022 WL 951218 (D. Kan. Mar. 30, 2022) ...........................................................................14

*Ashcroft v. Iqbal,*
556 U.S. 663 (2009).......................................................................................................8, 11

*Barchock v. CVS Health Corp.,*
886 F.3d 43 (1st Cir. 2018)...................................................................................................18

*Brown v. Daikin Am., Inc.,*
2021 WL 1758898 (S.D.N.Y. May 4, 2021) ......................................................................13

*Cunningham v. Bank of Am., N.A.,*
2013 WL 2455945 (D. Colo. June 6, 2013)...........................................................................2

*Fifth Third Bancorp v. Dudenhoeffer,*
573 U.S. 409 (2014).................................................................................................................8

*GFF Corp. v. Assoc. Wholesales Grocers, Inc.,*
130 F.3d 1381 (10th Cir. 1997) ...........................................................................................14

*Harmon v. Shell Oil Co.,*
No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021) ......................................................12

*Hecker v. Deere & Co.,*
556 F.3d 575 (7th Cir. 2009) .................................................................................................9

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999)................................................................................................................6

*Hughes v. Nw. Univ.,*
142 S. Ct. 737 (2022)..............................................................................................................8

*Johnson v. Providence Health & Servs.,*
2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) .................................................................2

*Kurtz v. Vail Corp.,*
511 F. Supp. 3d 1185 (D. Colo. 2021)....................................................................6, 8, 9, 18

*Lange v. Infinity Healthcare Phys.*,
    2021 WL 3022117 (W.D. Wis. July 16, 2021) .........................................................................6

*Leimkeuhler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) ................................................................................................5

*In re LinkedIn ERISA Litig.*,
    2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) ......................................................................7

*Matney v. Barrick Gold of N. Am., Inc.*,
    2022 WL 1186532 (D. Utah Apr. 21, 2022)................................................................ *passim*

*Mator v. Wesco Distrib., Inc.*,
    2022 WL 3566108 (W.D. Pa. Aug. 12, 2022) .....................................................................14

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) .............................................................................................8, 9

*Moitoso v. FMR LLC*,
    451 F. Supp. 3d 189 (D. Mass. 2020) .................................................................................12

*O'Driscoll v. Plexus Corp.*,
    2022 WL 3600824 (E.D. Wis. Aug. 23, 2022) .....................................................................7

*Parmer v. Land O'Lakes, Inc.*,
    518 F. Supp. 3d 1293 (D. Minn. 2021)................................................................................10

*Patterson v. Morgan Stanley*,
    2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .........................................................................7

*Perkins v. United Surgical Partners Int'l Inc.*,
    2022 WL 824839 (N.D. Tex. Mar. 18, 2022) .......................................................................6

*Ramos v. Banner Health*,
    461 F. Supp. 3d 1067 (D. Colo. 2020) (Martinez, J.), *aff'd*, 1 F.4th 769 (10th
    Cir. 2021) ....................................................................................................................4, 5, 13

*Ratheal v. United States*,
    2021 WL 3619902 (10th Cir. Aug. 16, 2021).......................................................................6

*Riley v. Olin Cop.*,
    2022 WL 2208953 ..............................................................................................................14

*Smith v. CommonSpirit Health*,
    2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ......................................................................17

*Smith v. CommonSpirit Health*,
 37 F.4th 1160 (6th Cir. 2022) ........................................................................ *passim*

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ............................................................................................. 6, 7

*Thole v. U.S. Bank N.A.*,
 140 S. Ct. 1615 (2021) ............................................................................................ 6

*VDARE Found. v. City of Colo. Springs*,
 11 F.4th 1151 (10th Cir. 2021) .............................................................................. 8

*Wehner v. Genentech, Inc.*,
 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ......................................................... 12

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
 325 F. App'x 31 (2d Cir. 2009) ............................................................................ 14

**Statutes and Regulations**

29 U.S.C. § 1104(a)(1) .................................................................................................. 1

29 C.F.R. § 2550.404a-5 ............................................................................................... 5

**Rules**

Fed. R. Civ. P. 8 .......................................................................................................... 11

Fed. R. Civ. P. 12(b)(1) ................................................................................... 1, 2, 6, 18

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1, 2, 8, 18

**INTRODUCTION**

This is one of more than 80 putative ERISA class actions Plaintiffs' same counsel has filed since 2020 against employers who sponsor 401(k) plans.  After waiving service, DaVita conferred with Plaintiffs' counsel in anticipation of moving to dismiss the original Complaint.  As agreed during that required conference, DaVita voluntarily produced additional contract documents, fee disclosures, account statements, a Plan fee benchmarking study, and other materials demonstrating that Plaintiffs' claims about the company's 401(k) plan fees were unfounded.  Dkt. 33 at 3, 5-7. Plaintiffs responded by filing the Amended Complaint, filled with largely the same copy-and-paste allegations as before.  The Amended Complaint is not interested in the truth.  It is interested only in what the Court might be persuaded to "accept as true," through liberties taken with source materials, misleading fee comparisons, and unsupported "inferences."[1]  In short, this case is a meritless product of a volume-driven business model, designed to pick the lock on the discovery floodgates in the hopes of leveraging a class settlement.  The Court should dismiss it.

Plaintiffs were participants in the DaVita Retirement Savings Plan.  They complain that the Plan offered three investment options that cost too much, but in which they ***never invested***, and incurred "unreasonable" recordkeeping fees that they ***never paid***.  Through these core allegations, Plaintiffs ask the Court to infer that the Plan's Administrative Committee failed to prudently monitor the Plan's fees, and that DaVita and its Board of Directors, in turn, failed to prudently monitor the Committee, all in violation of ERISA, 29 U.S.C. § 1104(a)(1).  Plaintiffs' claims should be dismissed under Rules 12(b)(1) and 12(b)(6).

---

[1] Another court in this Circuit recently rejected an amended complaint filed by Plaintiffs' same counsel under similar circumstances.  *See Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532, at \*5, \*10, \*11-13 (D. Utah Apr. 21, 2022).

1

To start, Plaintiffs lack Article III standing. Plaintiffs' allegations, admissions, and account statements refute any suggestion that they were personally injured by the three investment options they never selected but say were too pricey, or by the allegedly "unreasonable" recordkeeping fees they never incurred. Nor do Plaintiffs connect any personal injury to their generic "total plan cost" allegations. The Court should therefore dismiss the Amended Complaint under Rule 12(b)(1).

Plaintiffs' claims also fail on plausibility grounds. First, their contention that three of the Plan's actively managed investment options cost too much is based solely on a comparison to some mean and median fees reported in an industry survey (the "ICI Survey"). But the survey does not report fees for *comparable* actively managed equity funds; instead, it blends together all sorts of low cost *passively* managed funds and higher cost *actively* managed funds. For that reason, the survey makes clear that its mean and median statistics are "not intended for benchmarking the costs of specific plans." Unsurprisingly, then, courts in the Tenth Circuit and elsewhere have squarely rejected *identical* ICI Survey comparisons, peddled by Plaintiffs' same counsel, as insufficient to state a viable claim under ERISA. This Court should do the same.

Second, Plaintiffs' recordkeeping allegations fare no better. Plaintiffs have had full access to the Plan's recordkeeping contract, fee disclosures, and other documents confirming the Plan's recordkeeping fee was $37 per participant, until 2020 when the fee was reduced to $34.50.[2] This

---

[2] The Court may consider these documents (Exs. A-M) in applying Rule 12(b)(6), because they are referenced or cited in the Amended Complaint (*e.g.*, ¶¶ 19-23, 27, 66-68, 78 n.8, 85, 94-95, 102-103) and are central to its claims. *See, e.g.*, *Matney*, 2022 WL 1186532, at *3 (considering recordkeeping contract, fee disclosures, and other materials); *Johnson v. Providence Health & Servs.*, 2018 WL 1427421, at *3 (W.D. Wash. Mar. 22, 2018) (considering Form 5500s, fee disclosures, amendments to recordkeeping agreements, fund prospectuses, and others). To the extent these "documents contradict the allegations of the complaint, the documents control and the court need not accept as true the allegations in the complaint." *Cunningham v. Bank of Am., N.A.*, 2013 WL 2455945, at *3 (D. Colo. June 6, 2013) (cleaned up).

same information has been posted on a publicly-available Plan website for years.  Not only were the Plan's recordkeeping fees therefore consistent with or lower than those allegedly incurred by Plaintiffs' own comparator plans—foreclosing any plausible inference of imprudence—but Plaintiffs' desperate attempt to avoid that conclusion by speculating that the Plan might have paid more than the recordkeeping contract required is baseless and should be disregarded.

Third, Plaintiffs allege that the Plan's "total costs" were above average based on the ICI Survey discussed above.  But the survey contains no detail about the scope or nature of services the surveyed plans received, let alone the "total" costs any particular plan paid for whatever "total" services it received.  That is why the ICI Survey, again, emphasizes that the "broad averages" it reports are "not intended to benchmark the costs of specific plans."  Plaintiffs are simply misusing the survey's broad averages to provide some ostensible support for their meritless claims.  The Court should reject this tactic, just as other district and appellate courts have done.  *E.g.*, *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022).

Finally, Plaintiffs' separate claims against DaVita and its Board of Directors are wholly derivative of the claims against the Committee and, therefore, fail for the same reasons.

## RELEVANT FACTS AND ALLEGATIONS

### I.    DaVita, The Committee, And The Plan's Investments And Recordkeeping Fees

DaVita is a global healthcare company with more than 55,000 domestic employees.  *See* About DaVita (web-link).  The DaVita Retirement Savings Plan ("Plan") is one of many benefit programs DaVita voluntarily sponsors for those employees.  Am. Compl. ("AC") ¶ 26.  The Plan is a defined contribution plan under ERISA, allowing participants to invest voluntary and employer matching contributions among a diversified menu of investment options.  AC ¶¶ 34, 45, 47-48.

The Plan is managed by the Committee.  The Committee is responsible for selecting and monitoring the Plan's investment options and service providers, with the help of an independent advisor (Aon Hewitt).  AC ¶ 27; Ex. A, IPS at 5.  The Committee maintains an Investment Policy Statement ("IPS"), prescribing the process and guidelines the Committee follows in carrying out its responsibilities.  AC ¶ 27; Ex. A, IPS at 1-4, 7-10, 11-12.

Consistent with the IPS, the Committee has developed and maintained an investment menu of around 23 investment options, including: (i) twelve target-date retirement date funds; (ii) five actively managed equity and bond funds; (iii) four passively managed equity and bond index funds; (iv) a stable value fund; and (v) a DaVita company stock fund.  Ex. B, 2020 Participant Disclosure at 6-7.  Plaintiffs allege that three of the Plan's *actively* managed equity funds charged excessive fees, AC ¶¶ 68-71, but they do not complain about any other Plan options.  The Plan's actively managed equity funds charged expense ratios of 0.52% to 0.77%, AC ¶ 68, while its *passively* managed alternatives charged 0.02% to 0.04%, Ex. B, 2020 Participant Disclosure at 6-7.  The resulting asset weighted average expense ratio of these funds was under 0.16%.[3]

In 2015, the Committee hired Voya to provide Plan recordkeeping services for an annual fee of $37 times the number of total Plan participants; in 2020, the fee was renegotiated to

---

[3]The asset weighted average is easily calculated using the data reported in Plan's annual 404a-5 disclosure and Form 5500, both of which are referenced in the Amended Complaint:

| Fund | Assets | Weighting | Exp. Ratio | Wtd. Exp. Ratio |
|---|---|---|---|---|
| T. Rowe Price | 84,324,733 | 0.16378 | 0.56% | 0.0918% |
| Voya | 18,301,063 | 0.03557 | 0.77% | 0.0274% |
| Dodge & Cox | 17,848,123 | 0.03469 | 0.52% | 0.018% |
| Vang. Inst. Index | 254,332,774 | 0.49426 | 0.02% | 0.0099% |
| Vang. Ext. Mkt. Index | 139,762,489 | 0.27161 | 0.04% | 0.0109% |
| Total Assets Invested | 514,569,182 | | *Weighted Avg.:* | **0.1579%** |

Ex. C, 2020 Form 5500 at 38 (assets); Ex. B, 2020 Participant Disclosure at 6-7 (expense ratios).

$34.50.[4] This "per participant" recordkeeping fee was published on a publicly-available Plan website.[5] The fee was paid for through a combination of revenue sharing[6] from Plan investment options and direct participant charges, with Voya refunding any "excess" revenue sharing it received to the Plan.[7] Each year, plan disclosures, issued pursuant to 29 C.F.R. § 2550.404a-5, told participants how much could be charged to their individual Plan accounts for recordkeeping services.[8] Thereafter, quarterly account statements told each participant *exactly* how much they were actually charged for recordkeeping services, after offsetting revenue sharing payments made by Plan investment options to Voya.  *E.g.*, Ex. H, Teodosio Acct. Stmt. at 3 (Dec. 31, 2021).

## II.    Plaintiffs' Investments And Recordkeeping Fees

Plaintiffs allege that three of the Plan's investment options—the T. Rowe Price Large-Cap Growth Trust, the Voya Small Cap Opportunities Fund, and the Dodge & Cox Stock Fund—charged expense ratios exceeding the mean and median expense ratios reported in an ICI Survey. AC ¶¶ 68-71.  Plaintiffs did not invest in any of these options.  Dkt. 33 at 3.

---

[4] Ex. D, Admin. Servs. Agmt. at DAVITA_0000442 ($37); Ex. E, Amend. to Admin. Servs. Agmt. ¶ 2(b) ($34.50).

[5] *See* Ex. F, DaVita 401(k) Plan Key Features (screen shot).

[6] "Revenue sharing allows the fund manager of an investment option offered through a 401(k) plan to share a percentage of its fund management fee with the . . . [plan's] recordkeeper.  Revenue sharing arrangements are common in the investment industry, particularly where . . . recordkeepers do some work otherwise done by the investment company, such as tracking the holdings of each plan participant."  *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1101-1102 (D. Colo. 2020) (Martinez, J.), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (factual findings ¶¶ 142-143, 148); *see also, e.g.*, *Leimkeuhler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013) (similarly explaining how revenue sharing works).

[7] *See* Ex. D, Admin. Servs. Agmt. at DAVITA_0000441 ("Excess Revenue"); *cf. Ramos*, 461 F. Supp. 3d at 1102 (describing the same "hybrid approach").

[8] Plaintiffs reference these disclosures in alleging an annual fee of up to 0.11% to 0.14% could be applied to their Plan accounts.  *See, e.g.*, AC ¶ 21; Ex. G, 2016 Participant Disclosure at 2 ($37 maximum fee); Ex. B, 2020 Participant Disclosure at 2 (quarterly charge of 0.025%).

Plaintiffs also claim they were charged "unreasonable" recordkeeping fees.  According to Plaintiffs, a reasonable fee for those services was around $23-$36 per participant per year.  AC ¶¶ 94-95.  Plaintiffs' account statements confirm that they were never charged more than $10.56 in 2016-2017, or more than $8.70 in 2018-2021, for recordkeeping services.[9]

## ARGUMENT

**I.      Plaintiffs' Claims Should Be Dismissed On Standing Grounds Under Rule 12(b)(1).**

As a threshold matter, Plaintiffs lack Article III standing to assert their claims.  Standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).[10]The "injury" element requires a plaintiff to show that she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (citation omitted).  In putative class actions, the named plaintiff-representatives "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id.* at 338 n.6; *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2021) ("There is no ERISA exception to Article III.").  Here, Plaintiffs' own allegations, admissions, and account statements confirm that they have not, and cannot, establish an injury in fact with respect to any of their "excessive fee" theories.

---

[9]Ex. I, Summary of Plaintiffs' Account Statements.

[10]Plaintiff bears the burden of establishing the elements of standing.  When a Rule 12(b)(1) motion challenges standing based on the face of the pleading, the Court reviews the sufficiency of the pleaded allegations. *Ratheal v. United States*, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021).  When a motion challenges standing on factual grounds, the Court has wide discretion to consider evidence outside the pleadings. *Id.*

First, Plaintiffs admit that they never invested in any of the three actively managed equity funds they claim cost too much.  Dkt. 33 at 3.  Naturally, then, Plaintiffs cannot plausibly claim—much less prove—any personal injury to their Plan accounts resulting from those funds.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (participant benefits are determined by the investments held in their individual accounts).  In these circumstances, courts have uniformly held that plaintiffs lack standing to assert imprudent-investment claims under ERISA.[11]*E.g.*, *Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *4 (N.D. Tex. Mar. 18, 2022); *Lange v. Infinity Healthcare Phys.*, 2021 WL 3022117, at *2-4 (W.D. Wis. July 16, 2021); *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *4 (N.D. Cal. Nov. 16, 2021); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019).

Second, Plaintiffs were likewise uninjured by allegedly "unreasonable" recordkeeping fees, exceeding $23-$36 per year.  AC ¶¶ 84, 88-99.  Plaintiffs personally never paid more than $10.56 in recordkeeping fees, and typically paid considerably less.  *Supra* at 6.[12]  So they cannot establish a concrete injury under their own theory of the case, even assuming other members of the putative class might have paid more.  *See Spokeo*, 578 U.S. at 338 n.6 (named plaintiff cannot establish standing based on putative class member injuries); *see also O'Driscoll v. Plexus Corp.*,

---

[11]Plaintiffs will undoubtedly respond with cases rejecting standing arguments.  But in those cases, unlike here, the plaintiffs invested in *at least* one of the challenged funds, which the courts deemed sufficient to infer an injury resulting from the challenged decision-making process.  *See, e.g.*, *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1192 (D. Colo. 2021).  Because plaintiffs did not invest in *any* of the challenged funds, however, they have no similar jurisdictional hook.

[12]Plaintiffs allege, based on the Plan' annual participant disclosures in 2018-2020, that they were subject to annual fees of 0.11% to 0.14%. AC ¶ 21.  This was an "estimated" charge, which could be reduced by "revenue sharing" and "multiple [other] factors."Ex. B, 2020 Participant Disclosure at 1-2.  Plaintiffs' account statements confirm that these charges amounted to no more than $8.70 annually since 2018.  *See supra* at 6 (citing Ex. I).

2022 WL 3600824, at *4 (E.D. Wis. Aug. 23, 2022) (no Article III standing where plaintiff paid "$10 less than what she suggests is a reasonable recordkeeping . . . fee").

Finally, Plaintiffs allege that the Plan's "total costs" were too high.  AC ¶¶ 100-103.  But they do not allege which *particular* Plan costs were excessive, beyond those already discussed, let alone that they actually incurred those costs.[13]  Thus, Plaintiffs have not plausibly alleged that they "personally" suffered any "concrete and particularized" injury arising from their generic "total plan cost" allegations.  *Spokeo*, 578 U.S. at 339-340.

## II.   Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(6).

Even assuming Plaintiffs had standing to pursue their claims, they would still fail because Plaintiffs' allegations cannot support a plausible inference that the Committee failed to follow a prudent process for monitoring and managing the Plan's fees.

To avoid dismissal under Rule 12(b)(6), plaintiffs must plead "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  When

---

[13]Plaintiffs infer that the recordkeeping charges to their Plan accounts were used to pay Voya Retirement Advisors, LLC and Aon.  AC ¶ 21.  But they offer *no facts* to support this inference.  As Plaintiffs should know from disclosures they rely upon, Voya Retirement Advisors, LLC was Voya's *non-recordkeeping* affiliate, which provided "optional" investment advisory and account management services to participants who elected the service. *See* Ex. B, 2020 Participant Disclosure at 1-2; AC ¶ 78 (alleging a different entity, Voya Institutional Plan Services, provided the Plan's recordkeeping services).  That optional participant service was subject to a separate fee schedule, *id.* at 2 ("Professional Management Program" fees).  Plaintiffs do not allege that they ever elected this service or even that the fees charged for this optional participant service were unreasonable.  Similarly, as Plaintiffs know from the Form 5500 documents they incorporate by reference in the Amended Complaint, Aon provided investment advisory services to help the Committee monitor investments and service providers; Plaintiffs do not allege that Aon's annual fees were unreasonable, either.  Ex. C, 2020 Form 5500 at 6 (identifying Aon as Plan consultant).

"a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* In conducting this analysis, the Court must disregard allegations that are "no more than conclusions," and thus are "not entitled to the assumption of truth." *Id.* at 679. While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," the Court "need not accept conclusory allegations without supporting factual averments." *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021) (citations omitted).

In the ERISA context, specifically, motions to dismiss are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is because "the circumstances facing [fiduciaries] will implicate difficult tradeoffs, and courts must give due regard," at the pleadings stage, "to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). Thus, courts must focus on the *process* fiduciaries used to make a challenged decision— not its *results*. *Kurtz*, 511 F. Supp. 3d at 1196-97.While some plaintiffs may lack detailed information about the fiduciary's decision-making process, they "have extensive information" about the plan's investments and fees "because of ERISA's disclosure requirements." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018); *Smith*, 37 F.4th at 1168-69 (discussing the central role such disclosures and "publicly available information" play in "pleading a process-based" fiduciary breach claim under ERISA). Plaintiffs must use that information "and some circumstantial allegations about methods to show that 'a prudent fiduciary in like circumstances would have acted differently.'" *Meiners*, 898 F.3d at 822 (citation omitted); *Smith*, 37 F.4th at 1169.

Here, Plaintiffs have extensive information about the Plan's fees and the Committee's efforts to monitor them. Dkt. 33 at 5-7. Tellingly, however, they largely ignore or contradict these documents in favor of copy-and-paste allegations from other complaints their lawyers have filed. As a result, each of their theories fails to state a plausible claim for relief, as discussed below.

### A.     Plaintiffs' Investment Fee Allegations Fail.

Plaintiffs first claim the Committee failed to prudently monitor fees associated with the Plan's three actively managed domestic equity funds. The only facts Plaintiffs plead in support are that the funds' fees ranged from 0.52% to 0.77%, which exceeded the mean and median fees reported in an ICI Survey. AC ¶¶ 68-69. These allegations fail to state a claim.

To start, fees are just one factor fiduciaries must consider when evaluating investments. So the mere fact that a plan investment happened to cost more than some others available in the market cannot support any reasonable inference of fiduciary imprudence. After all, "[n]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *Smith*, 37 F.4th at 1169 (same); *Kurtz*, 511 F. Supp. 3d at 1198 (same). To plausibly allege "that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the *cost* . . . of the selected fund, a plaintiff must provide a sound basis for comparison—a *meaningful benchmark*." *Meiners*, 898 F.3d at 822 (emphasis added); *Smith*, 37 F.4th at 1167 (same); *Matney*, 2022 WL 1186532, at *10 (same). However, Plaintiffs do not even try to compare the fees associated with the three actively managed funds they challenge—which include a large-cap *growth* fund, a large-cap *value* fund, and a *small-cap* growth fund—to the fees of other actively managed funds in those same equity categories. Instead, they simply compare

them to the asset weighted mean and median fees for all *actively and passively* managed domestic equity funds, as reported in the ICI Survey.  Compl. ¶¶ 66-67.  Such comparisons cannot support a plausible inference of imprudence for at least three reasons.

 ***First***, the ICI Survey combines not only high cost actively managed and low cost passively managed funds, but also a range of other domestic equity funds (*e.g.*, small-cap, mid-cap, large-cap, small-mid cap, value, growth, blend).  As a result, its mean and median fees are useless for evaluating the fees of any particular equity investment.  That is why the ICI Survey expressly states that it is "***not intended for benchmarking*** the costs of specific plans" or investments.[14]  For these same reasons, courts in the Tenth Circuit and elsewhere have consistently rejected imprudent investment claims based on identical ICI Survey comparisons.  *See, e.g.*, *Matney*, 2022 WL 1186532, at *6 ("expense ratios from the ICI Study do not allow a meaningful analysis"); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303-04 (D. Minn. 2021) ("[T]he ICI Study median expense ratios are not meaningful benchmarks.").[15]  This Court should do the same.

 ***Second***, the logic underpinning Plaintiffs' reliance on the ICI Survey is absurd, because it would mean that *any* domestic equity fund with a fee exceeding the survey's mean and median is

---

[14]Ex. J, ICI Survey at 2, 12, 53 (web-link) (emphasis added) ("The fund investment categories used in this report are broad and encompass diverse investment styles within the investment types (e.g., active and index) . . . .  Consequently, this material is not intended for benchmarking").

[15]These decisions reflect both common sense and judicial recognition that passively managed funds are not meaningful benchmarks for evaluating actively managed funds—particularly when it comes to cost. *See, e.g.*, *Smith*, 37 F.4th at 1163 ("Little surprise, actively managed funds, which require considerable judgment and expertise, charge more than passively managed funds, which require little judgment and expertise."); *Matney*, 2022 WL 1186532, at *9-10 (the "different investment strategies" between actively an passively managed funds means they are not "sufficiently similar" for comparison); *Parmer*, 518 F. Supp. 3d at 1303-04 ("Although the ICI Study considers the size of the Plan and the 'category' of fund, it fails to differentiate between passively and actively managed funds.").

plausibly deemed imprudent—regardless of performance, strategy, or myriad other factors prudent fiduciaries would consider.  Indeed, under Plaintiffs' theory, half of all investments offered in the *thousands* of plans reflected in the ICI Survey—plus countless others offered in plans not surveyed—may be plausibly labeled "imprudent," such that *all* fiduciaries involved in selecting them can be sued and subjected to class action discovery.  While this simplistic standard would be a boon for ERISA class action lawyers, it cannot be squared with ERISA's duty of prudence, which requires fiduciaries to consider factors other than cost.  Nor can it be squared with Rule 8, which requires pleading more than a "sheer possibility" of misconduct.  *Iqbal*, 556 U.S. at 678.

*Third*, the ICI Survey, if anything, supports the opposite inference Plaintiffs advocate: that the Committee prudently secured reasonable investment fees.  The survey says that the asset weighted average expense ratio for passively and actively managed domestic equity funds offered in large retirement plans was 0.37%.  AC ¶ 69; Ex. J, ICI Survey at 58.  But, here, the Plan's asset-weighted average for those investments was under 0.16%—less than half the survey average.  *See supra* at 4.  By ignoring the Plan's low cost passively managed funds, Plaintiffs have unwittingly hoisted plausibility on their own (ICI Survey) petard.

### B.   Plaintiffs' Recordkeeping Allegations Fail.

Plaintiffs next claim the Court should infer the Committee lacked a prudent process for monitoring the Plan's recordkeeping fees.  These allegations fail for a host of reasons.

For starters, the recordkeeping contract, Plan disclosures, and public information in Plaintiffs' possession all confirm the Plan's annual recordkeeping fee was $37 per participant, until 2020 when it was reduced to $34.50.  *See supra* at 4-6.  These fees comport with those allegedly paid by Plaintiffs' own comparator plans ($23-$36 per participant).  AC ¶¶ 94-95.  Likewise, the

Plan's fees fit comfortably within the 25th to 75th percentile range ($30 to $48 per participant) paid by the largest retirement plans, as reported in the 2019 NEPC survey Plaintiffs incorporate by reference in the Amended Complaint.  AC ¶ 85; Ex. K, 2019 NEPC Def. Contrib. Prog. Rpt. at 10. In short, Plaintiffs' own purported "benchmarks" foreclose any plausible inference that the Committee failed to secure reasonable recordkeeping fees.[16]

Plaintiffs reinforce this conclusion with their carefully worded allegation that "there is little to suggest" the Committee "conducted an **_appropriate_** RFP" for recordkeeping services.  AC ¶ 86. Notice Plaintiffs' heavy emphasis (bold + italics) on the word "appropriate."  It is intended to stop short of suggesting the Committee conducted no RFP, which Plaintiffs know to be false.[17]  What Plaintiffs are actually alleging is that the Committee conducted an RFP, but that it might not have been "conducted **_appropriately_**."  Setting aside their linguistic gimmickry, Plaintiffs offer no facts plausibly inferring that the Committee mishandled the RFP.[18]  Plaintiffs are thus left with the

---

[16]Plaintiffs allege that, in another case, Fidelity stipulated that the value of recordkeeping services it provided to _its own_ company 401(k) plan was less than the $23-$36 per participant range allegedly paid by Plaintiffs' various comparator plans. AC ¶ 91 (citing _Moitoso v. FMR LLC_, 451 F. Supp. 3d 189, 214 (D. Mass. 2020)).  This is irrelevant.  The stipulation Fidelity provided in _Moitoso_ "does not reflect the value of the recordkeeping services that Fidelity provides to _different plans_ pursuant to _different recordkeeping contracts_ for a _different set of services_."  _Harmon v. Shell Oil Co._, No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021); _Wehner v. Genentech, Inc._, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (rejecting similar attempt to use Fidelity's stipulation in _Moitoso_ to support claims directed at another plan).

[17]During the pre-motion conferral process, Plaintiffs asked DaVita to disclose whether an RFP was conducted in 2015, just before the start of the alleged class period, when the Committee first hired Voya.  DaVita, through counsel, confirmed that, yes, an RFP was conducted.  This explains why, when Plaintiffs amended the original Complaint, they added heavy emphasis on the word "appropriate."  _Compare Compl._ ¶ 82 (no emphasis) _with_ AC ¶ 86 (heavy emphasis).

[18]Nothing in ERISA requires a fiduciary to conduct an RFP—appropriately or otherwise—so Plaintiffs' speculation that the Committee may have inappropriate conducted an RFP is irrelevant in any event. _See, e.g._, _Matney_, 2022 WL 1186532, at *12 ("nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval") (collecting cases).

following facts from their own complaint and incorporated documents: The Committee (1) conducted an RFP for recordkeeping services; (2) secured a $37 per participant fee from Voya in 2015, *see supra* at 2, 4-5; (3) complied with the Plan's IPS by engaging a Fee Benchmarking Report in 2019, *see* Ex. A, IPS at 5 ("fee evaluation reports"); Dkt. 33 at 7 (¶ 8); and (4) then negotiated a reduced recordkeeping fee of $34.50, *see supra* at 4-5. These facts do not support any plausible inference that the Committee's monitoring process was imprudent. *Matney*, 2022 WL 1186532, at *12 (facts showing "[d]efendants did manage, and reduce, [recordkeeping] fees over the years," through contract "re-negotiation," foreclosed inference of imprudence).

Nor does Plaintiffs' speculation that the Plan paid more than the contract required support any such inference. Although Plaintiffs admit the contractual fee in a footnote, they *estimate* that the Plan might have paid more. AC ¶¶ 78 n.9, 88. But their "estimates" include direct and indirect compensation Voya received for recordkeeping and *non-recordkeeping* services.[19] *See Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at *8 (S.D.N.Y. May 4, 2021) (alleged fees were "illusory" because they included fees for other services). Compounding that problem, Plaintiffs ignore all "indirect" compensation (*i.e.*, revenue sharing) Voya refunded back to the Plan. *See supra* at 5 n.7; *see also Ramos*, 461 F. Supp. at 1101 (describing same scenario in which revenue sharing is applied to fixed per participant fee, and any excess is refunded back to the plan). This is the same implausible tactic the district court correctly rejected a few months ago in *Matney*, 2022 WL

---

[19]Plaintiffs rely on Forms 5500 reporting that Voya Institutional Plan Services received direct or indirect compensation for ***four*** different coded services (27, 37, 49, 64). AC ¶ 78. But only ***one*** of the service codes is for Plan-wide recordkeeping services (code 64); the others are for non-recordkeeping services Voya provides, such as participant loans, participant communications, and "other services." *See id.*; *see also* Ex. D, Admin. Servs. Agmt. at DAVITA_0000442 (listing fees for additional services, like loans, QDROs, communications, and other items).

1186532, at *12 (dismissing claim that plan overpaid its $58-$63 contractual fee).  Moreover, Plaintiffs take a different approach when "estimating" their comparator plans' fees—*subtracting* all indirect compensation.  AC ¶ 94 n. 11.  In other words, Plaintiffs use two methodologies to "estimate" recordkeeping fees: one designed to *overstate* the Plan's fees, and another designed to *understate* their comparator-plan fees.  On this record, the Court should disregard Plaintiffs' self-servingly flawed "estimates" in favor of the fees prescribed in the Plan's governing contract.  *See Matney*, 2022 WL 1186532, at *12; *see also GFF Corp. v. Assoc. Wholesales Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").

In any event, Plaintiffs have not plausibly alleged that their comparators are meaningful benchmarks for evaluating the Plan's recordkeeping fees.  Despite having access to the Plan's contract, which contains 70 consecutive pages detailing Voya's extensive services,[20] Plaintiffs make no allegations about the specific scope or quality of those services—let alone how they match up to the unspecified services their comparator plans received.  Without those details, Plaintiffs' price comparisons cannot support a plausible inference that the Plan overpaid for the *particular* services it received, as numerous courts have held.[21]  And while Plaintiffs imply that all

---

[20]*See* Ex. D, Admin. Servs. Agmt. at DAVITA_0000364-439 (listing all services).

[21]*See, e.g.*, *Smith*, 37 F.4th at 1169 (affirming dismissal because plaintiff did "not plead[] that the services [the plan's] fee covers are equivalent to those provided by the [comparator] plans"); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (per curiam) (requiring "alleg[ations] that the fees were excessive relative to the services rendered"); *Matney*, 2022 WL 1186532, at *13 (dismissing recordkeeping-fee claim because it was "based on generalizations, assumptions, and unsuitable comparisons"); *Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *7 (W.D. Pa. Aug. 12, 2022) (dismissing recordkeeping-fee claim because "Plaintiffs have presented . . . no particularity as to the quality of the services that Plan participants received," and offered "price tag comparison[s]" without "sufficient details regarding services" received by plan

recordkeeping services and providers are equivalent, AC ¶¶ 73-77, this is belied by their own comparators whose fees varied widely, even between plans that used the *same* recordkeepers, *id.* ¶¶ 94-95.  Plaintiffs' allegations, thus, boil down to the same simplistic "price tag to price tag comparison" courts have deemed insufficient to support a plausible breach of fiduciary duty claim. *Mator*, 2022 WL 3566108, at *7; *see also supra* 11 n.15 (collecting cases).

Finally, the fees Plaintiffs assign to their comparators are not plausibly supported, either. As discussed, Plaintiffs ignore all indirect compensation their comparator-plans' recordkeepers received.  Their only excuse for this tactic is that their comparator plans supposedly "have little to no revenue sharing."  AC ¶¶ 94 n. 11, 95.  But that assertion is both unsupported and untrue.  For example, the recordkeeper for the Publicis Plan Plaintiffs cite, *id.*, received over *$545,000* in revenue sharing from just three investment options in a single year.[22]  That is no "little" amount. The truth is, according to the Forms 5500 Plaintiffs relied upon, *see id.*, ***all*** of their comparator-plan recordkeepers received indirect compensation—Plaintiffs just don't know how much.  But that is not the only problem with their comparator-plan fee estimates. Under Plaintiffs' own methodology, several of their comparators paid more than $23-$36 per participant in direct recordkeeping fees:  the Sanofi plan paid **$43 to $44** in 2018-20; the S. Cal. Permanente plan paid

---

or comparator plans); *Riley v. Olin Cop.*, 2022 WL 2208953, at *4 (E.D. Mo. June 21, 2022 (same); *Anderson v. Coca-Cola Bottlers' Ass'n*, 2022 WL 951218, at *11 (D. Kan. Mar. 30, 2022) (same).
[22]This is not a fact dispute; it is just math.  The revenue sharing amount is easily calculated by multiplying the revenue-sharing percentages for each of the following three funds times the total assets invested in those funds:  T. Rowe Price Equity Income Fund; PIMCO Income Fund Class A; and T. Rowe Price Blue Chip Growth Fund.  Ex. L, Publicis Form 5500 at 9, 11, 61.

**$41 to $48** in 2019-20; the Health First plan paid **$51 to $55** in 2019-20; and the Vibra plan paid **$53 to $58** in 2019-20.[23]  There are more examples, but these sufficiently illustrate the point.

### C.   Plaintiffs' "Total Plan Cost" Allegations Fail.

Last, Plaintiffs ask the Court to infer that the Committee breached its duty of prudence because the Plan's total costs in 2019 were higher than the "total plan cost" average reported in the ICI survey.  AC ¶¶ 100-103.  These allegations are too generic to support a plausible inference of imprudence, as the Sixth Circuit recently affirmed.  *Smith*, 37 F.4th at 1169.

To start, Plaintiffs' allegations are duplicative of their implausible theories above.  Beyond the fees already discussed, Plaintiffs do not allege that the Plan incurred unreasonable fees for any other *particular* Plan service *or* investment option.  For example, while Plaintiffs note that Voya offered *optional* investment advice and "managed account" services to participants, they do not allege that those unique services or fees were unreasonable (or that they ever elected those optional participant services).  *See* AC ¶ 77.  Such omissions render their total-cost allegations far too generic to support any plausible inference that the Committee failed to prudently monitor the Plan's total fees.  *Smith*, 37 F.4th at 1169.

Nor have Plaintiffs established that the ICI Survey's "total plan cost" average is a meaningful benchmark.  A plan's total costs are a function of many factors.[24]  But neither the

---

[23]Again, this is not a factual dispute—Plaintiffs just botched the math.  Ex. L, Chart Calculating Comparator Plan Fees Based On Plaintiffs' Documents And Methodology.

[24]For example, investment management fees will be higher for plans that, like the Plan here, offer actively managed funds.  *Smith*, 37 F.4th at 1160, 1169.  Likewise, for plans that offer both actively managed and passively managed options, fees will vary based on which participants choose.  *See id.*  Similarly, some plans, including the Plan here, offer optional participant investment advice and management services, *see supra* at 8 n.13, which naturally increase total plan costs relative to plans that do not offer those services.  Moreover, even for more commonly offered services, like participant loans and QDRO processing, plans with more participants available to elect those

Amended Complaint nor the ICI Survey does anything to account for those factors, let alone explain the distribution of different fees and services across the numerous plans reflected in the survey. It is like arguing that one fan overspent on the Rockies game because she paid more than the average ticket holder, without knowing where her seats were located, what game she attended, whether she paid for parking, or purchased food, beverages, or souvenirs. A naked comparison to the broad average tells us nothing about the reasonableness of any particular amount the fan spent, much less the total amount she spent. The same is true here: Comparing the Plan's total cost to the ICI Survey average says nothing about the reasonableness of the fees paid for any particular investment or service—much less the total fees paid for *all* investments and services. That is why the ICI Survey makes clear that its "broad averages" are "not intended for benchmarking the cost of specific plans[.]" Ex. J, ICI Survey at 12. Likewise, those broad averages cannot support any plausible inference of excess fees or fiduciary imprudence.

For much the same reasons, the Sixth Circuit recently affirmed the dismissal of excessive fee claims that were based on the same ICI Survey comparison. *Smith*, 37 F.4th at 1169. In *Smith*, the plaintiff alleged that the plan's total investment management fees (0.55% of plan assets) alone exceeded the "total plan cost" average reported in the ICI Survey. *See Smith v. CommonSpirit Health*, 2021 WL 4097052, at *9-10 (E.D. Ky. Sept. 8, 2021). The district court rejected these allegations, because a "higher than average" fee is insufficient to support a plausible inference of fiduciary imprudence, especially considering that investment management fees "vary based on the

---

services will incur higher fees. The same goes for plans, like the Plan here, that utilize per-participant pricing for recordkeeping fees—*i.e.*, more participants means more total costs incurred. Finally, beyond investments, plan services, and participant services, plan costs can also vary depending on whether the plan retains an investment advisor to assist its fiduciaries, hires outside legal counsel, or engages other consultants or advisors to help administer the plan.

type of investment chosen." *Id.* The Sixth Circuit affirmed, explaining that an "average plan-wide management fee of 0.55% is merely evidence that [the plan] offers a number of actively managed funds," and thus comparison to the "total plan cost" average reported in the ICI Survey could not support any plausible inference of imprudence. *Smith*, 37 F.4th at 1169.

The same analysis applies here. As in *Smith*, the Plan offers a variety of passively managed investments, with fees as low as 0.02%, and actively managed alternatives, with fees as high as 0.77%. AC ¶¶ 68-69; Ex. B, 2020 Participant Disclosure at 6-7. So the Plan's alleged "total cost" of 0.53% of Plan assets in 2019 "is merely evidence that [the plan] offers a number of actively managed funds," and provides no basis for inferring fiduciary imprudence. *Smith*, 37 F.4th at 1169. Indeed, that conclusion is even clearer in this case, because the Plan's total cost for investment management *and all other Plan services and optional participant services* amounted to 0.53% of Plan assets in 2019, AC ¶ 103, whereas investment management fees *alone* were 0.55% of total plan assets in *Smith*.[25] As in that case, generically comparing the Plan's total fees with the "total plan cost" average in the ICI Survey cannot support a plausible claim for breach of fiduciary duty under ERISA. *See id.* at 1169; *accord Matney*, 2022 WL 1186532, at *12 (survey "averages" could not "create anything more than the 'mere possibility' of misconduct") (citation omitted); *Barchock v. CVS Health Corp.*, 886 F.3d 43, 52 (1st Cir. 2018) (same).

---

[25]Plaintiffs' related criticism of the weighted average expense ratio of the Plan's investment options (the largest component of the Plan's total costs) fails for similar reasons. AC ¶ 103. Plaintiffs do not specifically challenge the expense ratios charged by any of the Plan's investments, other than the three discussed *supra* at 10-12, let alone identify any meaningful benchmark for doing so. Moreover, as the Sixth Circuit recognized, the Plan's average investment expense is a function of the inclusion of actively managed funds in the Plan (and participants' individual decisions to invest in those funds). *See Smith*, 37 F.4th at 1169; *see also id.* at 1165 (offering actively managed funds is prudent; it might be imprudent *not* to offer actively managed funds in a plan).

**III.     Plaintiffs' Derivative Failure To Monitor Claims Against DaVita And Its Board Fail.**

In Count II, Plaintiffs allege that DaVita and its Board of Directors breached their separate duty to monitor the Committee, whose members they were allegedly responsible for appointing. As the Amended Complaint makes clear, this claim is wholly dependent on the viability of Plaintiffs' underlying breach of fiduciary duty claims against the Committee, AC ¶¶ 113-118, so it fails for all the same reasons discussed above. *See, e.g.*, *Matney*, 2022 WL 1186532, at *13-14 (dismissing derivative "failure to monitor" claims); *Kurtz*, 511 F. Supp. 3d at 1202 (same).

**IV.     Certification Of Conference.**

Pursuant to Section III(D)(1) of the Court's Practice Standards, DaVita's counsel hereby certifies that they conferred with counsel for Plaintiffs regarding the sufficiency of Plaintiffs' Complaint on May 26 and July 15, 2022.  As agreed during that conference, DaVita voluntarily produced an agreed-upon set of additional documents.  Dkt. 33 at 5-7.  Plaintiffs, thereafter, filed an Amended Complaint.  DaVita's counsel determined that Plaintiffs' Amended Complaint remained deficient and should be dismissed under Rules 12(b)(1) and 12(b)(6), which it conveyed to Plaintiffs' during and after the initial status conference in this case.

**CONCLUSION**

For all of the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice under Rule 12(b)(1) and/or Rule 12(b)(6).

Dated: August 26, 2022                               Respectfully submitted,

*/s/ Christopher J. Boran*

Christopher J. Boran
Eric M. Makinen
MORGAN, LEWIS & BOCKIUS LLP

20

110 N. Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 324-1000 (phone), (312) 324-1001 (fax)
christopher.boran@morganlewis.com
eric.makinen@morganlewis.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on August 26, 2022, a true and correct copy of the foregoing document was

filed electronically via the Court's CM/ECF system, which will automatically provide notice to all

counsel of record.

*/s/ Christopher J. Boran*