**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 22-cv-0712-WJM-MDB

LOURDES M. TEODOSIO,
AMBER BROCK,
GAROON J. GIBBS-RACHO, and
DAMON A. PARKS, SR., individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

DAVITA, INC.,
THE BOARD OF DIRECTORS OF DAVITA, INC.,
THE PLAN ADMINISTRATIVE COMMITTEE OF DAVITA, INC., and
JOHN DOES 1–30,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS UNDER RULES 12(b)1) AND 12(b)(6)**

---

Lourdes M. Teodosio, Amber Brock, Garoon J. Gibbs-Racho, and Damon A. Parks, Sr. (collectively, "Plaintiffs") bring this putative class action on behalf of themselves and others similarly situated against DaVita, Inc. ("DaVita"), DaVita's Board of Directors, DaVita's Plan Administrative Committee, and thirty unnamed individuals for alleged breaches of the fiduciary duty of prudence imposed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and failure to adequately monitor fiduciaries. (ECF No. 20.)

Currently before the Court is Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) (ECF No. 35) ("Motion"), which is ripe for disposition (*see* ECF Nos. 41, 46). For the reasons stated below, the Motion is granted in part and denied in

part as set forth in this Order.

## I. LEGAL STANDARD

### A.    Rule 12(b)(1)

A motion under Federal Rule of Civil Procedure 12(b)(1) is a request for the court to dismiss a claim for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A plaintiff generally bears the burden of establishing that the court has jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  When the court lacks subject-matter jurisdiction over a claim for relief, dismissal is proper under Rule 12(b)(1).  *Safe Streets All. V. Hickenlooper*, 859 F.3d 865, 877 (10th Cir. 2017).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial attacks and factual attacks.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  A facial attack questions merely the sufficiency of the pleading. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  When reviewing a facial attack, the court takes the allegations in the complaint as true, as in a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Id.*  If those allegations establish a federally cognizable claim, jurisdiction exists.  *Id.*

In contrast, if a Rule 12(b)(1) motion "challenge[s] the substance of a complaint's jurisdictional allegations in spite of its formal sufficiency by relying on affidavits or any other evidence properly before the court[,] '[i]t then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (quoting *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).  On a factual attack, no presumption of truthfulness applies to the complaint's allegations.  *Holt*, 46

F.3d at 1003.  Instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist.  *Id.*  In making its decision, the court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Stuart*, 271 F.3d at 1225 (citation omitted).

Unless it is shown that no amendment of the pleadings could cure the jurisdictional defect, a dismissal for lack of subject-matter jurisdiction generally is not a decision on the merits and, therefore, constitutes a dismissal without prejudice.  *See Bruzga v. Cnty. of Boulder*, 795 F. App'x 599, 604–05 (10th Cir. 2020) (stating that a dismissal based on lack of standing should be without prejudice); see also Fed. R. Civ. P. 41(b).

**B.     Rule 12(b)(6)**

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also Iqbal*, 556 U.S.

at 678.

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## II. BACKGROUND[1]

Plaintiffs are former employees of DaVita who participated in the DaVita Retirement Savings Plan (the "Plan") during their employment. (*See* ¶¶ 19–22.) The Plan is a defined-contribution plan to which employees elected participation and directed their own investments within the options made available through the Plan. (¶¶ 45–48, 53–52.) Plan participants, including Plaintiffs, incurred several fees. (¶ 56.)

---

[1] The following factual summary is drawn from the First Amended Complaint (ECF No. 20), except where otherwise stated. The Court assumes the allegations in the First Amended Complaint are true for the purposes of deciding the Motion to Dismiss. *See Ridge at Red Hawk*, 493 F.3d at 1177.

All citations to docketed materials—other than to the First Amended Complaint—are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Citations to (¶ __), without more, are references to the First Amended Complaint.

Among these fees were management and recordkeeping[2] fees Plaintiffs allege were unreasonably high.  (¶¶ 68–69, 88–96.)  Plaintiffs allege they and other Plan participants were subjected to these unreasonably high fees because Defendants failed to prudently select appropriate investment options and appropriately negotiate reasonable recordkeeping fees, as was their fiduciary duty under ERISA.  (¶¶ 57–99.)

The management fees participants paid depended on the investment options they selected.  Each investment option charges a fee calculated as a percentage of the overall value of the participant's investment; this is known as the "expense ratio."  (*E.g.*, ¶ 64.)  Plaintiffs identify three of the Plan's mutual funds as having had materially higher expense ratios than the average expense ratios of similar funds, as found by a 2018 study by the Investment Company Institute.  Plaintiffs allege the unreasonable cost of these investment options suggests it is "unlikely the Defendants engaged in a prudent process [of identifying and removing investment options with unreasonable fees] from 2016 through 2020."  (¶ 70.)  Plaintiffs did not personally invest in any of the specifically challenged funds.  (ECF No. 33 at 3.)

The recordkeeping fees participants paid came in two varieties: direct and indirect.  (¶ 80.)  Direct fees are flat fees paid directly from plan assets, whereas indirect fees (also known as "revenue sharing") are funds collected by the entity offering the investment and forwarded to the recordkeeper.  (*Id.*)  Indirect fees are paid as a percentage of the value of the investments and therefore increase in absolute terms as

---

[2] The First Amended Complaint speaks more broadly of "administrative and recordkeeping" fees, which it refers to using the initialism "RKA."  (*E.g.*, ¶ 19.)  While the Order refers to the same allegedly unreasonable fees only as "recordkeeping fees," they are the same as the "RKA" fees discussed in the First Amended Complaint and Plaintiffs' briefing on the Motion.

the number of participants and the value of their collective investments in the Plan increase.  (¶¶ 81–82.)  Because large plans, like the Plan, have a lot of bargaining power, their participants tend to pay less in recordkeeping fees than those of smaller plans.  (¶ 79.)  Further, Plaintiffs allege there are several "national recordkeepers" that offer relatively fungible services, which results in prudent fiduciaries regularly using this bargaining power to shop for lower rates.  (¶¶ 77, 82–83.)  Throughout the putative class period, the Plan used Voya Institutional Plan Services as its recordkeeper and never conducted a request for proposals to compare Voya's services and rates with those of other recordkeepers.  (¶¶ 78, 85–86.)

In addition to direct fees ranging from $34.50 to $37, Plan participants paid indirect fees ranging from 11 to 14 basis points over the putative class period, despite "prudent fiduciaries of defined contribution plans negotiat[ing] recordkeeping fees as a fixed dollar amount" to avoid paying more for services that should in fact become cheaper as the Plan grows.  (¶ 82, 84.)  The First Amended Complaint contains several tables comparing the total recordkeeping fees paid by the Plan to those paid by other comparable plans.  (¶¶ 88–95.)  Though, as discussed below, Defendants take issue with Plaintiffs' characterization of these tables as establishing a fair comparison.  *See infra*, Part III.A.2.  Further, Plaintiffs allege national recordkeeping company Fidelity has admitted in federal court that its recordkeeping services for a similar plan were worth substantially less than what the Plan paid during the putative class period.  (¶ 92.)  According to Plaintiffs, these excessive fees demonstrate Defendants breached their duty to prudently monitor recordkeeping fees and prevent the Plan from paying unreasonable rates.  (¶¶ 97–99.)

### III. ANALYSIS[3]

**A.      Rule 12(b)(1) Challenge**

Defendants' jurisdictional challenge rests on standing.  (ECF No. 35 at 11–13.)

For a court to have subject-matter jurisdiction, a plaintiff must have standing.  *Friends of*

*the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000).  At its

"irreducible constitutional minimum," standing has three elements.  *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 560 (1992).  First, a plaintiff must suffer an "injury in fact" that is

concrete and particularized, and actual or imminent, not conjectural or hypothetical.  *Id.*

Second, the injury must be traceable to the challenged action of the defendant.  *Id.*

Third, it must be likely that the injury will be redressed by the relief requested.  *Id.*

Standing is determined as of the time the action is brought.  *Nova Health Sys. v. Gandy*,

416 F.3d 1149, 1154 (10th Cir. 2005).  Defendants' arguments focus on the injury-in-

fact component of the standing inquiry.  (ECF No. 35 at 11–13.)

Further, the Court interprets the Motion as a facial attack (*see* ECF No. 35 at 11–

12) and therefore assumes the allegations in the First Amended Complaint are true,

except to the extent Defendants argue its factual assertions are inconsistent with

documents incorporated by reference (*see infra*, Part III.A.1).

1.      <u>Management Fees</u>

Defendants argue the Plaintiffs cannot show they were personally injured by the

allegedly imprudent investment options made available by the Plan because Plaintiffs

---

[3] In addition to the management and recordkeeping fees theories, Plaintiffs assert damages based on the "total cost" of the Plan to participants.  Because this theory offers no additional facts regarding fees paid by participants—instead merely summing the allegedly excessive management and recordkeeping fees—the Court does not separately discuss the "total cost" theory under either Rule 12(b)(1) or 12(b)(6).  (¶¶ 100–03.)

did not invest in any of the challenged funds.  (*Id.* at 12.)  As Defendants tell it, under "these circumstances, courts have uniformly held that plaintiffs lack standing to assert imprudent-investment claims under ERISA."  (*Id.*)  Anticipating Plaintiffs' argument, Defendants distinguish the facts of this case from cases in which courts have held that plaintiffs who "invested in *at least* one of the challenged funds," had standing to bring class actions on behalf of absent class members even for injuries caused by investments the named plaintiffs never owned.  (*Id.* at 12 n.11.)

Plaintiffs respond that the "overwhelming majority of courts have found plaintiffs have standing to assert investment management claims regardless of whether they personally invested in the mutual funds held by unnamed class members."  (ECF No. 41 at 22.)  "Contrary to Defendants' assertions, [they argue,] 'Plaintiffs do not need to make a showing of investment in each fund to demonstrate standing.'"  (*Id.* (quoting *Cunningham v. Cornell Univ.* 2019 WL 275827, at *3 (S.D.N.Y. Jan. 22, 2019).)

While the Court has not been able to locate a Tenth Circuit decision resolving the parties' divergent views, the Court adopts what it has determined to be the majority position of courts that have considered this issue.  Specifically, the Court holds that for Plaintiffs to have standing to sue on behalf of absent putative class members, they do not need to have invested *each* of the allegedly imprudent funds; however, they must have elected to invest in at least *one* such fund, and the absent putative class members' injuries must be "rooted in Defendants' conduct in managing all the funds as a group." *Kurtz v. Vail Corp.* 511 F. Supp. 3d 1185, 1193 (D. Colo. 2021) (quoting *Hay v. Gucci Am.*, 2018 WL 481558, at *4 (D.N.J. Oct. 3, 2018)); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591–94 (8th Cir. 2009); *Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D.

559, 566–68 (D. Minn. 2014).

Since it is undisputed that none of the Plaintiffs invested in any of the challenged funds, the Court finds they lack standing to bring their breach of fiduciary duty claim under a management fee theory.  (ECF No. 33 at 3.)  Accordingly, the Court dismisses that theory of the claim without prejudice.  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, . . . the dismissal must be without prejudice.").

    2.   <u>Recordkeeping Fees</u>

With respect to the recordkeeping fees, Defendants argue Plaintiffs have not suffered any injury because while the annual per-participant recordkeeping fees paid by the Plan exceeded the $23–$36 benchmark identified as reasonable in the First Amended Complaint, Plaintiffs themselves never paid more than $10.56 in any year during the putative class period.  (ECF No. 12–13.)

Plaintiffs emphasize that because their claims are brought on behalf of the Plan itself, the fact they personally paid less than the benchmark fees does not mean the fees were in fact reasonable, and any restoration of benefits to the Plan would benefit all participants (including them).  (ECF No. 41 at 20–21.)

Unlike the management fee theory, where allegedly excessive fees are entirely a function of which investments participants selected, Plaintiffs allege that many of the Plan's recordkeeping fees were "bundled."  (¶¶ 74–75.)  While a portion of the recordkeeping fees were calculated as a percent of assets—and that percent may have

even varied based on the selected investment[4]—for these bundled services, the Plan paid a "flat," per-participant fee.  (*Id.* ¶¶ 74, 84.)  Therefore, if the Plan was paying unreasonable recordkeeping fees, a refund of a portion of those fees would benefit all participants, including Plaintiffs.  *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2022 WL 973581, at *4 (W.D. Pa. Mar. 31, 2022).  Just because Plaintiffs may ultimately recover less than absent putative class members does not mean that have not been indirectly injured by the allegedly excessive fees charged to the Plan and passed along to them. *See Hawkins v. Cintas Corp.*, 32 F. 4th 625, 632–33 (6th Cir. 2022) ("Although § 502(a)(2) claims are brought by individual plaintiffs, it is the [P]lan that takes legal claim to the recovery, suggesting that the claim really 'belongs' to the Plan.")

The Court finds Plaintiffs have suffered a particularized injury with respect to the recordkeeping fees.  Because Defendants make no other arguments with respect to standing, the Court finds Plaintiffs have standing and that the Court has subject-matter jurisdiction to consider this claim.

## B.    Rule 12(b)(6)

Because the Court concludes in Part III.A.1 that it does not have jurisdiction to consider Plaintiffs' management fees theory, it need consider Defendants' Rule 12(b)(6) argument only with respect to Plaintiffs' remaining recordkeeping fees claim.  "To properly assert an ERISA claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1), a plaintiff must allege facts that plausibly demonstrate that: (1) the

---

[4] The allegation in the First Amended Complaint that "[e]ach of the Plaintiffs were invested in funds that had this tacked-on expense ratio that was unreasonably high" perhaps suggests that some Plan investments were not subject to indirect recordkeeping fees via revenue sharing.  (¶ 23.)  Even if that is the case, however, because all participants were subject to a flat fee, and that flat fee was part of the Plan's overall recordkeeping arrangement, the reasonableness of that arrangement impacts all participants.

defendant was a plan fiduciary, (2) the defendant breached its fiduciary duty, and (3) that the breach resulted in harm to the plaintiff."  *Kurtz*, 511 F. Supp. 3d at 1196. "Under ERISA a 'prudent' fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'"  *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)).

Defendants begin their Rule 12(b)(6) argument by demonstrating that during the Class Period, the Plan paid $37 per participant until 2020, when the fee was reduced to $34.50 per participant.  (ECF No. 35 at 17–18.)  Because these amounts "comport with" the benchmark fee ranges Plaintiffs incorporate into the First Amended Complaint, "any plausible inference" that Defendants "failed to secure reasonable recordkeeping fees" is "foreclosed."  (*Id.* at 8.)

Defendants point to an inconsistency in the methodologies used to calculate the recordkeeping fees paid by the Plan and allegedly comparable plans.  In preparing tables estimating total recordkeeping fees paid by the Plan during the Class Period, the First Amended Complaint calculates the per participant fees by summing the direct "flat fees" and indirect "revenue-sharing" fees and dividing by the number of participants. (*See id.* at 19; *see* ¶ 88.)  In contrast, the "comparator plans" presented in the First Amended Complaint were explicitly "chosen" because they "have little to no revenue sharing."  (¶ 94, n.11.)  Not only does this render these other plans unhelpful "apples-to-oranges" comparisons, Defendants argue, it is not even factually accurate that the comparator plans all have "little to no revenue sharing."  (ECF No. 35 at 19–22.)  As Defendants point out, the Form 5500 for one of the comparator plans reveals that it paid

more than $545,000 in indirect (revenue sharing) recordkeeping fees on just three investment options.  (*Id.* at 20–21 (citing *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.")); *see also GFF Corp.*, 130 F.3d at 1384–85 ("When a complaint refers to a document and the document is central to the plaintiff's claim," a court may consider it without converting a motion to dismiss to a motion for summary judgment.).)

Defendants also address prominent recordkeeper Fidelity's stipulation in another lawsuit that the recordkeeping services it provided to its own retirement plan were worth between $14 and $21 per participant.  In Defendants' view, the stipulation is "irrelevant" because it reflects only the value of the recordkeeping services Fidelity provided to its own plan and not the services it or other companies provide to other plans under different contracts.  (ECF No. 35 at 18 n.16 (citing *Wehner v. Genentech, Inc.* 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021)).)

Plaintiffs respond that any miscalculations of comparator-plan fees are "inconsequential" because (1) the Court should not consider "counter-facts" at this stage of the litigation and (2) "Defendants do not deny the essence of Plaintiffs' allegations" that the Plan is more expensive than the average plan.  (ECF No. 41 at 16–17.)  With respect to Fidelity's stipulation, Plaintiffs argue alleging this fact is enough to survive a motion to dismiss because assessing the scope of the services Fidelity valued at $14– $21 per participant and comparing them to the services actually received by the Plan is fact-intensive and inappropriate at this stage of the litigation.  (*Id.* at 17–19.)

Defendants' arguments are generally well-taken.  Like the court in *Garnick v.*

*Wake Forest University Baptist Medical Center*, 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022), the Court finds Plaintiffs' comparator-plan allegations "fail to plausibly allege imprudence" because the comparisons offered in the First Amended Complaint "attempt[t] to allege imprudence through an 'apples-to-oranges' comparison when an 'apples-to-apples' comparison is necessary." *Id.* However, also like the *Garnick* court, the Court finds the fact-intensive nature of comparing the recordkeeping services actually received by the Plan to those Fidelity valued at $14–$21 makes it inappropriate for the Court to disregard the First Amended Complaint's well-pleaded allegations at this stage of the litigation. *Id.* This is true even though Defendants may ultimately be correct that the Fidelity stipulation is of little evidentiary value due to differences between the plans. Therefore, the Court assumes as true the allegations that the Plan was generally paying approximately $50 (and in one year $96) per participant[5] for a service that was worth as little as between $14–$21. On these facts, the Court finds Plaintiffs have stated a claim upon which relief can be granted.

Accordingly, the Motion under Rule 12(b)(6) is denied with respect to the recordkeeping fees theory.

### C.    Failure to Monitor

Defendants argue Plaintiffs' failure-to-monitor claim is "wholly dependent on the viability of Plaintiffs' underlying breach of fiduciary duty claims." (ECF No. 35 at 25.)

---

[5] The Court acknowledges Defendants' argument that these calculations fail to consider the "excess" recordkeeping fees refunded to the Plan under the contract between it and Voya, which Defendants' filed with the Court under seal. (ECF No. 35 at 5 n.7, 19.) Setting aside whether it is proper for the Court to consider this document on a motion to dismiss, Defendants failed to explain to the Court how to interpret the relevant provisions of the contract. (*See id.*) The Court will not disregard allegations in the First Amended Complaint as implausible or contradicted by a document integral to the complaint without any explanation of how to understand that document, and it is not the Court's job to make Defendants' arguments for them.

Therefore, they further argue the failure-to-monitor claim "fails for all the same reasons." (*Id.*)  Because the Court does not dismiss the breach of fiduciary duty claim in full, the Court denies the Motion with respect to the failure-to-monitor claim.

**IV. CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) (ECF No. 35) is GRANTED in part and DENIED in part as set forth above; and

2.  Plaintiffs are granted leave to file a motion for leave to file a second amended complaint, which addresses the issues raised in this Order, by no later than **August 31, 2023**.

Dated this 26th day of July, 2023.

BY THE COURT:

William J. Martínez
Senior United States District Judge